## In re WEBSTER LOOSE LEAF FILING CO.

(District Court, D. New Jersey. December 29, 1916.)

1. CHATTEL MORTGAGES ☞192 — RECORDING — NECESSITY — STATUTE—"IMMEDIATE."

Under Comp. St. N. J. 1910, p. 463, providing that every chattel mortgage not accompanied by an immediate delivery and followed by an actual and continued change of possession shall be void as against the creditors of the mortgagor unless it be recorded as directed in the succeeding section of the act, the word "immediate" extends throughout the provision and applies to recording as well as to delivery, and requires possession and recording as soon as may be by reasonable dispatch under the circumstances of the case.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 434–437.

For other definitions, see Words and Phrases, First and Second Series, Immediate.]

2. CHATTEL MORTGAGES ☞192—RECORDING—DELAY—EXCUSE.

The requirement of 1 Comp. St. N. J. 1910, p. 463, that a chattel mortgage be recorded immediately, is absolute, and delay reasonably explained and satisfactory to the parties is not a compliance therewith.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 434–437.]

3. CHATTEL MORTGAGES ☞192—RECORDING—PAYMENT OF FEES.

Where the attorney of a chattel mortgagee transmitted it by mail to the register for recording accompanied by a statement that he would promptly remit on learning the amount of the fee, and the mortgage was not recorded until the fee was remitted four days after its execution, the mortgage was not immediately recorded as required by 1 Comp. St. N. J. 1910, p. 463, in view of 4 Comp. St. 1910, p. 4642, authorizing the register to withhold recording until the fees were prepaid.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 434–437.]

4. CORPORATIONS ☞313—DIRECTORS—ADVERSE INTEREST—ATTORNEY FOR MORTGAGEE.

An attorney for a director of a corporation who was also a director, having received shares necessary to qualify him from his client without paying any consideration therefor, and who, at a directors' meeting presented a proposal on behalf of his client to loan money to the corporation on security of a chattel mortgage and thereafter voted as director to accept the proposition, was acting throughout in the interests of his client, which were adverse to the interests of the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1387.]

5. CORPORATIONS ☞298(5)—DIRECTORS' MEETINGS—"QUORUM."

Where the by-laws of a corporation did not fix the number required for a quorum, a majority of the directors constitute a "quorum."

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1302–1312.

For other definitions, see Words and Phrases, First and Second Series, Quorum.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. CORPORATIONS ⬮⇒298(5)—DIRECTORS—QUORUM—ADVERSE INTEREST.
Where one of the directors of a corporation whose presence is necessary to constitute a quorum or whose vote is necessary to constitute a majority of a quorum is disqualified by adverse personal interest, any action of the directors is invalid, and the fairness or unfairness of the transaction will not be considered.
[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1302–1312.]

7. CORPORATIONS ⬮⇒545(3)—RIGHTS OF TRUSTEE—INVALID MORTGAGE—RETURN OF CONSIDERATION.
The directors of a corporation, who hold a chattel mortgage on the corporate property which was invalid because executed under authority voted by a director who represented the mortgagee as well as the corporation, cannot thereby acquire property over innocent creditors represented by the trustee in bankruptcy of the corporation, though the corporation itself could not disavow the mortgage without returning the consideration.
[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2170.]

8. CORPORATIONS ⬮⇒298(1)—CHATTEL MORTGAGE—AUTHORITY TO EXECUTE—DIRECTORS' MEETING.
Two of the three directors of a corporation cannot authorize the execution of a chattel mortgage by an informal agreement between themselves without a directors' meeting having been called or a resolution adopted.
[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1292, 1293, 1314, 1317.]

In Bankruptcy. In the matter of the Webster Loose Leaf Filing Company, bankrupt. On review of an order of the referee sustaining in part the validity of a chattel mortgage executed by the bankrupt corporation to one of its directors. Order reversed, and mortgage held invalid.

Raymond, Mountain, Van Blarcom & Marsh, of Newark, N. J., for trustee.

Randolph Perkins, of Jersey City, N. J., for Anita L. Pearson.

DAVIS, District Judge. This cause is before this court on review of an order made by the referee in bankruptcy sustaining in part the validity of a chattel mortgage for $10,000 executed by the Webster Loose Leaf Filing Company, a corporation, on March 15, 1915, to Anita L. Pearson, one of the directors of said company.

I find it unnecessary to consider all of the errors assigned and exceptions taken to the order.

[1] The referee found that the mortgage was not recorded immediately, in accordance with the requirements of the New Jersey statute which provides:

"That every mortgage or conveyance intended to operate as a mortgage of goods and chattels hereafter made, which shall not be accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things mortgaged, shall be absolutely void as against the creditors of the mortgagor, and as against subsequent purchasers and mortgagees in good faith, unless the mortgage, having annexed thereto an affidavit or affirmation made and subscribed by the holder of said mortgage, his agent, or attorney, stating the consideration of said mortgage and as nearly as possible the amount due and to grow due thereon, be recorded as directed in the succeeding section of this act." Compiled Stat. of N. J. vol. 1, p. 463.

⬮⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The force of the word "immediate" extends throughout the sentence in the statute and applies to the word "recorded" as well as to "delivery." Immediate possession and immediate recording mean as soon as may be by reasonable dispatch under the circumstances of the case. Roe v. Meding, 53 N. J. Eq. 350, 368, 30 Atl. 587, 33 Atl. 394; Dunham v. Cramer, 63 N. J. Eq. 151, 51 Atl. 1011; Hardcastle v. Stiles et al., 69 N. J. Law, 551, 55 Atl. 104; Brockhurst v. Cox, 71 N. J. Eq. 703, 64 Atl. 182; Gulden v. Lucas, 81 N. J. Eq. 106, 85 Atl. 902; Bollschweiler v. Packer House Hotel Co., 83 N. J. Eq. 459, 91 Atl. 1027.

[2] The requirements of the statute are absolute, and delay reasonably explained and satisfactory to the parties is not a compliance with the statute. Bollschweiler v. Packer House Hotel Co., supra.

[3] The mortgage in question was executed on March 15, 1915, by the bankrupt corporation to Anita L. Pearson, who was at that time confined to her home in New York by illness. The mortgage was delivered to her by Gerard Roberts, her attorney, between 4 and 5 o'clock in the afternoon of the same day, at which time Mrs. Pearson took the statutory affidavit to the mortgage. The following morning, Roberts secured a certificate from the county clerk of New York county, N. Y., of authority of the commissioner before whom Mrs. Pearson took the affidavit. This certificate was attached to the mortgage, which was sent by mail the morning of the 16th to the register of Hudson county, N. J., with a letter of which the following is a copy:

"I send you herewith for record, chattel mortgage from Webster Loose Leaf Filing Company to Anita L. Pearson. If you will let me know what your fees are, I will promptly remit."

Roberts received a postal on March 18th telling him that the recording fee was $2.75. He at once mailed check for that amount to the register, and the mortgage was recorded on the following morning, March 19, 1915, at 9:33 o'clock. This was not an immediate recording as soon as might have been by reasonable dispatch under the circumstances of the case. A messenger might have reached the office of the register on the morning of March 16, 1915, after securing the said certificate, or the mortgage would probably have reached the office by mail in the afternoon of that day, or at the latest the morning of the following day, and would have been immediately thereafter recorded, if it had been accompanied by a check to pay the recording fees. Mr. Roberts knew by his past experience with this same office a month before, the testimony shows, that the register would not record the morgage until the fees for so doing were paid. The statute provides that registers may demand payment of fees for recording before the work is actually done.

"The said surrogates and county clerks, and the said registers of deeds and mortgages, shall be personally liable to their respective counties for the payment of all such fees and costs as are mentioned in the first section of this act, and for their own protection it shall be lawful for them to exact the payment of such fees and costs before filing any paper, entering and docketing any writ, order or judgment, recording any paper, making a copy or search, or performing any other services in their said offices for which costs, fees or compensation is allowed." Comp. Stat. vol. 4, p. 4642.

Deeds and mortgages sent to the county clerks or registers not accompanied with the fees for recording are not properly lodged with them for that purpose. In the case of Dickerson v. Bowers, 42 N. J. Eq. 295, 296, 11 Atl. 142, the court said:

"I am not satisfied that the deeds were 'lodged' with the clerk for record within the true meaning of the act. * * * I do not discover by the act that the clerk can refuse to record until the fees are paid."

This case was decided before the passage of the act enabling the clerk to demand payment for his fees before deeds and mortgages are recorded. Since the passage of the act, it is all the more true that deeds and mortgages are not properly lodged with registers for recording until the fees for so doing are paid. The mortgage therefore was not immediately recorded as required by the chattel mortgage act and is void as against the trustee, in so far as the creditors of the bankrupt company on March 19, 1915, are concerned.

[4] But a more serious question arises regarding the validity of this mortgage: Did a quorum of the directors qualified to act accept on January 12, 1915, the proposition submitted on behalf of Anita L. Pearson, mortgagee, and pass the resolution authorizing the execution of the mortgage for $10,000 to her? Some time prior to January 12, 1915, Anita L. Pearson transferred, without consideration, sufficient stock in the bankrupt company to Gerard Roberts to make him eligible for director in said company. At the annual meeting of the stockholders, January 12, 1915, Anita L. Pearson, Gerard Roberts, and Bradford Webster were elected directors of the bankrupt company, by the stockholders. Immediately after the close of the meeting of the stockholders on said day, a directors' meeting was held at which only Gerard Roberts and Bradford Webster, two of the three directors, were present. At that meeting, a proposition was submitted on behalf of Anita L. Pearson, by Gerard Roberts, one of the three directors of the company, by the terms of which she agreed to loan the company $10,000 on a chattel mortgage on certain property of the corporation. This proposition was accepted by Roberts and Webster, and the following resolution passed by them:

"Resolved that the proper officers of this company be and they are hereby authorized and directed to execute and deliver to Mrs. Pearson a chattel mortgage covering the property of the company now in existence or hereafter to be acquired by the company of the sort named above, upon the execution by Mrs. Pearson jointly with said company of notes to the amount of $10,000."

While according to the minutes of the meeting Anita L. Pearson appears to have been present, yet as a matter of fact it is admitted that she was not present.

It is alleged that at this time and in all matters pertaining to the mortgage, so far as Anita L. Pearson is concerned, she was represented by Gerard Roberts as attorney. In order to determine the question of whether or not a quorum of directors qualified to act in accepting the proposition submitted on behalf of Mrs. Pearson and in passing the resolution authorizing the execution of the mortgage for $10,000 was present, it is necessary to determine whether or not Gerard Roberts was acting as attorney for Mrs. Pearson and for and in be-

half of her interest. If he was, the legal effect of such action is the same as if Mrs. Pearson herself had voted instead of Roberts.

It is admitted that Gerard Roberts was the attorney of Mrs. Pearson at this time. Mrs. Pearson was the administratrix of the estate of her husband, who had died some time in the year 1914. Mr. Roberts was the attorney of the husband of Mrs. Pearson during his lifetime, and also represented Mrs. Pearson as administratrix of the estate of her husband, which was in process of settlement.

The corporation was financially embarrassed at this time, and Mrs. Pearson was interested in the corporation to the extent of about $20,-000, and, as I understand it, was the largest stockholder. In order to protect her interest in the corporation, she doubtless wanted the ability and advice of her attorney in directing its affairs. He was not a stockholder, which was necessary in order to become a member of the board of directors. She, accordingly, transferred to him certain shares of stock, without consideration, and at the annual meeting of the stockholders, on the second Tuesday of January, 1915, Gerard Roberts was elected a director. At this meeting, Roberts held a proxy for Mrs. Pearson. At the meeting of the board of directors, immediately following that of the stockholders, a proposition was submitted by Gerard Roberts, for and on behalf of Anita L. Pearson, by the terms of which she agreed to loan the company $10,000 upon a chattel mortgage upon its property named in the resolution subsequently passed. Roberts and Webster voted on the proposition, which had been submitted by Roberts, and passed the said resolution. The mortgage was prepared by Roberts. Mrs. Pearson accepted his judgment as to the legality of the transaction and validity of the mortgage. She employed no other attorney to examine the mortgage, or to investigate the transaction for her. After the mortgage had been executed by the bankrupt company, it was delivered to Roberts for Mrs. Pearson. He took the same to her, and, after the affidavit as to the consideration for the mortgage had been taken by her, she delivered it to him to have recorded for her. In fact, Roberts had possession of the mortgage from the time it was drawn until he delivered it to be recorded. After it was recorded, he delivered the mortgage to Mrs. Pearson. During the bankruptcy proceedings, when its validity was questioned, he got it again from her. In fact, Roberts negotiated the whole proposition, so far as Mrs. Pearson is concerned, of the mortgage transaction and attended to every detail of it so far as it concerned her. When it was discovered that the affairs of the company were involved, Mrs. Pearson asked Roberts to have an appraisal of the plant and the raw material made. When proceedings were instituted in the name of Mrs. Pearson against the bankrupt company by Randolph Perkins, it was Mr. Roberts who authorized the institution of proceedings and furnished the data therefor. Mr. Perkins at the time suit was begun had never seen Mrs. Pearson. On November 24, 1915, Mr. Roberts testified before the referee as follows: .

"Q. Did you represent Mrs. Pearson at the time the chattel mortgage was given to her on the property of the Webster Loose Leaf Filing Company? A. Yes. ·

"Q. At what time was that? A. That was in March, 1915.

"Q. And you were present at the negotiations concerning that? A. Yes.
"Q. And familiar with the entire transaction? A. Yes." Page 2 of the testimony.

On page 10 of the testimony, of the same date, Mr. Roberts further testified as follows:

"Q. The loan of $10,000 is represented by any other instrument than the chattel mortgage? A. A note—chattel mortgage given as collateral security for the note.
"Q. Know the date of the note? A. Same date as the mortgage.
"Q. Who is it signed by? A. Both Mr. Webster and myself, as I remember it.
"Q. At that time, you were acting in the dual capacity of treasurer of the corporation and attorney for Mrs. Anita L. Pearson? A. Yes, that is right."

It seems to me that the conclusion is irresistible that at this time Gerard Roberts was acting as the attorney for Mrs. Pearson; that he was made a stockholder and director at her suggestion and through her influence; that he had no financial interest in the corporation aside from the salary which he drew as secretary and treasurer; that his principal interest in the corporation was the interest of Mrs. Pearson; and that, as her attorney, he had been made a stockholder and director for the sole purpose of protecting her interest. His acts, therefore, so far as this mortgage was concerned, were her acts, and the legal effect of his vote in passing the resolution, which authorized the execution of the mortgage, is the same as if she herself had voted.

[5] It required the vote of Roberts to pass the resolution in the directors' meeting of January 12, 1915. The by-laws contained no resolution fixing the number required for a quorum. In the absence of such regulation, a majority of the directors constitute a "quorum," and, when regularly assembled, may transact any business which the corporation has a right to transact under the provisions of its charter. Wells v. Rahway White Rubber Co., 19 N. J. Eq. 402; Holcombe v. Trenton White City Co., 80 N. J. Eq. 122, 132, 82 Atl. 618; Cook on Corporations (7th Ed.) 712; 10 Cyc. 776.

The court in the case of the Metropolitan Telephone Co. v. Domestic Telegraph Co., 44 N. J. Eq. 568, 573, 14 Atl. 907, 910, said:

"When power is given to be exercised by several, in the absence of a rule requiring the concurrence of a definite number, a majority of a quorum duly convened may act."

The committee in the last-cited case, which held a meeting, was composed of four members, only three of which were present. One of the members, Mr. Harrison, was a director or trustee in both companies. The court said:

"He occupied a similar fiduciary relation to each of the two companies. In performing his duty as a member of the committee of the Bell Company, he was required to use his judgment in fixing the terms of the contract with the Domestic Company, in which he was interested. To sustain his capacity to do this would be like permitting one to be judge in his own case. * * * But the point now under discussion relates solely to the power of Harrison to take part in settling the terms of a contract in which he was adversely interested. In my judgment he was incapacitated so to do, and so no quorum of the committee was present capable of acting."

[6] All of the directors constituting a quorum must be qualified to act. If one of the directors whose presence is necessary to constitute a quorum, or whose vote is necessary to constitute a majority of a quorum, is disqualified by reason of his personal interest, any act done by the body is invalid.   10 Cyc. p. 777; Cook on Corporations (7th Ed.) 713a; Van Hook v. Somerville Mfg. Co., 5 N. J. Eq. 159.   The rule rests upon the broad principle that it is the duty of each director in acting for the corporation to do so in the best interest of the corporation.  His duty to the corporation is first.  It is a duty he cannot perform if his own interest is adverse to that of the corporation.   So insidious are the promptings of self-interest, and so great is the danger that it will override duty, when brought into conflict with it, that sound policy requires that such contract should not be enforced or regarded. He occupies the position of a judge passing upon his own case.  The proposition in behalf of Mrs. Pearson was presented at the meeting on January 12, 1915, by Gerard Roberts, her attorney, who in turn voted upon the proposition submitted by himself.  The court said in the case of Van Hook v. Somerville Mfg. Co., that an interested director in such a transaction, voting a mortgage to himself, must be regarded as a stranger.   10 Cyc. 777, 781;  Cook on Corporations (7th Ed.) 713a;  Van Hook v. Somerville Mfg. Co., 5 N. J. Eq. 159;  Coryell v. President and Managers of the New Hope Del. Bridge Co., 9 N. J. Eq. 459;  Stewart v. Lehigh Valley R. Co., 38 N. J. Law 505, 522;  Metropolitan Telephone Co. v. Domestic Telegraph Co., 44 N. J. Eq. 568, 14 Atl. 907;  Wall v. Utah Copper Co. et al., 70 N. J. Eq. 17, 25, 26, 62 Atl. 533;  Curtin v. Salmon River, etc., Co., 130 Cal. 345, 349, 350, 62 Pac. 552, 80 Am. St. Rep. 132;  Federal Life Ins. Co. v. Griffin, 173 Ill. App. 5;  Burton v. Lithic Mfg. Co., 73 Or. 605, 144 Pac. 1149.

So strictly is this principle adhered to that no question is allowed to be raised as to the fairness or unfairness of the contract so entered into.   In such cases, the court will not pause to inquire whether a director or trustee has acted fairly or unfairly; being interested in the subject-matter, he may not as a trustee or director deal with himself, and thus be subjected to the temptation to advance his own interests. Stewart v. Lehigh Valley R. Co., supra; Shakespear v. Smith, 77 Cal. 640, 20 Pac. 294, 11 Am. St. Rep. 327;  Curtin v. Salmon River, etc., Co., 130 Cal. 345, 349, 350, 62 Pac. 552, 80 Am. St. Rep. 132.

Mrs. Pearson was directly interested in the mortgage.   Gerard Roberts testified on November 24, 1915, as follows:

"It became apparent in the fall of 1914 that something would have to be done if the company was going to continue in business. * * * It became apparent that, if anything was going to be done, a substantial sum would have to be raised in some way.  Mrs. Pearson had a heavy interest at that time, about $20,000.  Mr. Webster didn't seem to be a person to take interest in the matter, and it became evident that if Mrs. Pearson wanted to save her money she would have to put some more in."

The mortgagee had about $20,000 in the corporation, and, in order to save that and to advance her own interest, she entered into the agreement which resulted in the execution of the mortgage to her. Mrs. Pearson concluded that if she "wanted to save her money she

240 F.—50

would have to put some more in." This explains the $10,000 loan. Her attorney made the proposition for her. Her attorney voted on the resolution, and his vote was necessary to pass it. It was the interest of Mrs. Pearson that both he and she were trying to preserve.

[7] The contest here is not between the mortgagee and a corporation over a contract which is ultra vires. If such were the case, before the corporation could disavow the contract, it would have to replace the money. This is a contest between the trustee in bankruptcy, who represents innocent creditors, some of whom had given credit to the corporation before the execution of the mortgage and some of them afterward, and a director who with her attorney dominated the corporation. It is, in fact, a contest between innocent third parties who were not acquainted with the financial condition of the corporation, and a director who knew the facts. It is a contest between persons who innocently gave credit to the corporation, and a director who loaned the corporation $10,000 for the purpose of saving $20,000, which was in danger of being lost. It would be inequitable to allow her, through her own vote or the vote of her attorney and representative in the board of directors, to acquire priority over innocent third parties.

[8] There is a question as to whether or not the $10,000 mortgage, under consideration, was ever authorized or was executed in pursuance of the resolution of January 12, 1915. A $7,500 mortgage was executed, which, however, was paid by part of the loan of $10,000 for which the mortgage was subsequently given. The mortgage under consideration does not correspond, as to the property it covers, with the terms of the resolution, and, if the mortgage were valid and based upon a legal resolution, it would have to be reformed so as to correspond with the resolution, provided it was executed in pursuance thereof. The resolution of January 12, 1915, states what specific property the mortgage is to cover, "the sort named above." The $10,000 mortgage executed on March 15, 1915, and now under consideration, covers, not only the property mentioned in the resolution, but also all other property of the corporation; and it is stated by Mr. Roberts that this mortgage was the result of conferences and discussions which he and Mr. Webster, another director, had. He testified on February 28, 1916, as follows:

"Mr. Perkins:

"Q. Was there a meeting in February at which action was taken by the board of directors on this mortgage (the mortgage in question)? A. Just prior to the making of the appraisal.

"Q. What was the action? A. Simply to the effect, to make up for the deficiency in the accounts receivable and having anticipated a deficiency in the machinery, that Mrs. Pearson could have a mortgage on all the property of the corporation—everything they had.

"Q. How much was the mortgage to be? A. $10,000. You understand the mortgage as it was executed on the 10th of February was only for $7,500, but it covered all the property of the corporation.

"Q. What was the action of the board of directors, if any, with respect to the after-acquired property of the corporation? A. That was included in the mortgage.

"Q. What was the action of the board of directors? A. The proposition as it was discussed in fact was—as it was discussed on the 1st of February.

"Q. What was the action of the board of directors with reference to after-acquired property? A. It was agreed that Mrs. Pearson should have a mortgage on all the property of the corporation, which should be in fact a running mortgage; that is to say, that any time she saw fit to foreclose the mortgage, it should cover everything the company then had, whether it was in possession of the company then or became in possession of the company afterwards.

"Referee:

"Q. By what formal method, if any, did the board of directors agree to that? A. There was not anything formal.

"Q. By resolution? A. Discussions between Mr. Webster and myself at the time.

"Q. Not put in the form of a resolution? A. Either Mr. Webster proposed something—we had the discussions at that time about this proposed appraisal, and undoubtedly an appraisal would show that it was less.

"Q. And this was an informal agreement on the part of you and Mr. Webster, is that right? A. I didn't consider it an informal agreement. There was not any motion. We didn't say, 'I move,' and, 'I second.' There was only two of us there, and we both agreed that that should be done.

"Q. And that is the only action that had been taken at a directors' meeting up to the time of the making of the mortgage? A. Some action taken at the meeting of January 12th, at that meeting."

There is no record whatever of any meeting between January 12, 1915, and the following August. Mr. Roberts said it was discussed on February 1st by him and Mr. Webster, "that Mrs. Pearson could have a mortgage on all the property of the corporation—everything they had." Mr. Webster, on the other hand, says that no meeting was held at that time, and their discussion was not different from many others which they had from time to time as they met in the office of the corporation, or at Mr. Roberts' office. It appears therefore that this mortgage for $10,000 covering all the property of the corporation was authorized, not at any meeting regularly and legally called of the directors, but was the result of a private agreement which Roberts and Webster made after discussing the matter from time to time as they met in the regular course of their business at the office of the corporation, or at the office of Roberts in New York, and Webster says this is exactly what happened. If this be true, the mortgage in question therefore was never legally authorized, and is therefore invalid for that reason.

If, however, that were not the case, and the mortgage was executed in pursuance of the authority contained in the resolution of January 12, 1915, it is void as a mortgage. Mrs. Pearson herself could not vote upon a proposition in which she was interested, if her vote was necessary to pass the resolution. If she could not vote, neither could her attorney, who represented her in the board. I am constrained therefore to hold that the mortgage in question is void and of no effect. Mrs. Pearson will have to stand with general creditors. An order will be entered in accordance with the conclusions herein reached.